■    In the Matter of the Estate of ALEXANDER R. VERITY, Deceased. FIRST NATIONAL CITY BANK, as Trustee for VICTORIA A. HOLMES and Another, Appellant-Respondent; VICTORIA A. HOLMES et al., Respondents-Appellants; RANDALL F. BRAHE, Individually and as Executor of AUGUST H. BRAHE, Deceased, et al., Appellants-Respondents; VICTORIA L. VERITY et al., Respondents.— In this proceeding to settle an intermediate account of First National City Bank as trustee of two trusts, the appeals are from two decrees of the Surrogate's Court, Kings County, entered October 27, 1972 and July 30, 1973, respectively. The trustee appeals from so much of the first decree as (1) adjudged that the trustee was guilty of gross neglect with respect to one of the trusts, the one established for the benefit of the testator's two daughters, in failing to make the trust productive; (2) surcharged the trustee $23,298.27; (3) adjudged that a certain 1946 consent and release (referred to in the decree as made in "1947") executed by the daughters was ineffective to bind them with respect to the conduct of the trustee subsequent to the date thereof; and (4) adjudged that the *in terrorem* clause in a certain probate compromise agreement of 1926 had no legal force and effect upon the daughters, who in 1926 were infants. The daughters cross-appealed from stated portions of this decree. The trustee, a remainderman (Harry Levy) and the executor (Randall F. Brahe) of the estate of another remainderman appeal from so much of the second degree as (1) authorized and directed the trustee to invade the principal of the daughters' trust (122½ shares of stock of O'Flyn & Verity, Inc.) by transferring it equally to the daughters and (2) terminated that trust. The trustee also appeals from the further portion of this decree which "confirms" the $23,298.07 surcharge; said remainderman and executor of a remainderman's estate also appeal from so much of this decree as failed to deny the relief requested in a petition by one of the daughters, Beatrice F. Craig; and the daughters cross-appealed from another portion of this decree. Appeals by the daughters dismissed, without costs. The daughters have abandoned their appeals, their briefs asking only for affirmance of both decrees. Decree entered October 27, 1972, affirmed insofar as appealed from by the trustee, without costs, on the opinions of the Surrogate dated July 9, 1969 and May 25, 1972. Decree entered July 30, 1973, reversed insofar as appealed from by appellants other than the daughters, on the law, and proceeding remitted to the Surrogate's Court, Kings County, for a hearing on the issues presented by the petition of Beatrice F. Craig and the answers thereto, limited to a determination as to (1) whether there exists a need to authorize or direct invasion of the corpus of the daughters' trust and (2) whether the transfer to the daughters of the shares of the stock of O'Flyn & Verity, Inc., might be financially beneficial to them, thus justifying termination of the trust, with costs to abide the event. The appeals by said appellants from this decree presented no questions of fact. The testator died on October 25, 1925, leaving a wife and two infant daughters, Victoria A. Holmes and Beatrice F. Craig. By his will, as modified by a codicil and as further modified by a court-authorized compromise agreement, the testator established a trust for the benefit of his two daughters, whereby they were to receive the income from the principal of the trust (122½ shares of

stock of O'Flyn & Verity, Inc. — a closely held corporation) during their lifetimes, with remainders over to Harry Levy and, if he be dead, to Charles A. Peterson and Jacob Mayer in equal shares, or to the survivor of them. Peterson died on August 25, 1969. Levy, Mayer, Peterson and the testator were officers, directors and stockholders of O'Flyn & Verity, Inc. for many years after its incorporation around 1921, as was August H. Brahe, deceased, father of appellant Brahe. The decree on the executor's accounting, dated March 28, 1947, directed, *inter alia*, the executor, who is also the trustee under the will, to distribute the 122½ shares of stock of O'Flyn & Verity, Inc., to the daughters' trust, which it did. The trustee thereafter, relying upon a consent and release agreement executed in 1946, took no further action with respect to this trust. In 1967 the trustee filed its intermediate accounting. It showed that the daughters' trust neither received nor produced any income during the 20-year period covered by the accounting. The daughters filed objections to the account and the Surrogate, after a trial on the objections, and in an opinion dated July 9, 1969, found that the trustee was guilty of gross neglect in failing to make the trust productive, in that it did not sell the stock and invest the proceeds of such a sale, and surcharged the trustee accordingly. Thereafter, and by petition dated October 5, 1971, Beatrice F. Craig, one of the daughters, alleged that the parties were unable to agree on a proposed decree. She requested omnibus relief. Her sister, Victoria A. Holmes (now Padden), did not join in or consent to this petition. The joint answer of Randall F. Brahe, individually and as executor of the will of August H. Brahe, deceased, and Harry Levy denied various allegations of Mrs. Craig's petition and set up four affirmative defenses. The trustee also filed an answer to this petition. In the opinion of the Surrogate dated May 25, 1972, he iterated some of the facts and noted what was to be included in the decree to be entered on his previous decision. Thereafter, the first decree now under review was made. In a further opinion, dated January 30, 1973, the Surrogate authorized the trustee to invade the principal of the trust in whole or in part, in its discretion, and further authorized the trustee to invade the total principal by distributing the shares equally to the two daughters. He further directed that, in the event the trustee was unwilling to do this of its own accord, it must invade the principal and thus distribute the shares, thus terminating the trust. The second decree under review was thereupon entered. We concern ourselves only with one contention raised by appellants Brahe and Levy, to wit: that a hearing should be held to determine whether there exists a need to authorize or direct invasion of the corpus of the daughters' trust. We find the proof presented to be deficient in this regard and, accordingly, direct that such a hearing be held, limited to this issue and also for the taking of proof as to whether the transfer of the shares of stock of O'Flyn & Verity, Inc., to the daughters might be financially beneficial to them, thus justifying termination of the trust. We have considered the other contentions raised and find them to be without merit. Latham, Acting P. J., Christ and Brennan, JJ., concur; Cohalan and Munder, JJ., concur in part and dissent in part and vote (1) to dismiss the daughters' appeals; (2) to modify the decree entered October 27, 1972, by striking therefrom the decretal provisions (a) adjudging the trustee bank to be guilty of gross neglect with respect to the trust established for the benefit of the testator's daughters, in failing to make the trust productive and (b) surcharging the trustee $23,298.27; (3) to modify the decree entered July 30, 1973, by striking therefrom the provisions which confirms said surcharge; and (4) to affirm, as so modified, both decrees insofar as appealed from by appellants other than the daughters. The facts set

forth in the majority opinion require some elaboration. The 122½ shares of stock represented a portion of a full capitalization of 500 shares (492 issued). The closely held corporation is a service corporation that conducts tax searches for lending institutions. As the firm prospered the directors — who were and are the tax search specialists — annually increased their salaries in direct proportion to the increased income earned. There is no question that over a 20-year period (1947 to 1966) the gross corporate income leaped from $127,000 to $583,000 and the officers' salaries increased from $50,000 overall to $120,000. The Surrogate found the increases in salary were "commensurate with the increase in business and the full time devoted to this service business." He also found that the directors were justified in not declaring dividends and that there was no fraud involved. We part company with the Surrogate on his conclusions. It is undoubtedly true that the book value of the stock increased over the years from $10 to $134 per share, but the latter evaluation was made in an estate tax proceeding and bore no relation to a sale in the open market or even vis-à-vis stockholders of the corporation. In his opinion of July 9, 1969, the Surrogate noted that "at the very least it [the trustees] had the duty to request instructions from the beneficiaries or the Court [citing cases]." No doubt that would have been the politic step to take, but, as both earlier and later events proved, it would have been an exercise in futility. A compromise agreement (entered into during the minority of the two daughters, wherein they were represented by a special guardian), joined in by all the interested parties, was executed in 1926. By its terms, the testator's widow was to be paid $90 per week, $40 of which was for the support of her two daughters. These payments, euphemistically termed "salary", were to be reduced to $50 when the younger of the two girls attained her majority (in 1935). This was done. Later, the $50 was increased to $60, and payments in the latter amount have continued to this day, for until death or remarriage of the widow the "salary" is to be paid. Mrs. Verity is now 92 years of age. An *in terrorem* clause in the compromise agreement provided that if any proceedings were taken by the beneficiaries, or any of them, to rescind or abrogate the agreement, the payments to the widow would immediately be terminated. Rather than jeopardize the continuance of the "salary", the daughters permitted the situation to continue for nearly 30 years without demur. Under the circumstances, it is difficult to perceive in what respect the trustee could be guilty of gross neglect, for neglect does not exist in a vacuum. It must relate to an act on which its existence depends. And with no market wherein to sell the stock and no way in which to make it productive, the trustee was on the horns of an insoluable dilemma. The Surrogate, in fixing what it termed "theoretical" damages, concluded "on the evidence that the stock could have been sold by the Trustee at that time [1950] to other stockholders of the Corporation." The only stockholder who was at all receptive to the prospect of purchasing the stock made an offer at the time of trial, which was rejected, and there has been no change in the stockholders or in their holdings since before 1950. The question of surcharge is discussed in Warren's Heaton Surrogate's Courts (6th ed., vol. 3, § 267, par. 1, subd. [a]). It reads in pertinent part as follows: "In considering the nature of the surcharge that may be made against a representative who fails to invest estate funds, it is obvious that here we have not an actual asset of the estate which has been lost through some act of the representative. Where this latter situation results, the amount for which the representative is liable is easily ascertained. It is the value of the asset lost. This, however, clearly does not apply to income which the representative has failed to obtain by not investing the estate funds. Con-

fronted with this situation, it is obvious that all that the court can do in surcharging a representative is to hold him liable for the income which he might reasonably have been expected to obtain had he invested the funds. This, however, does not mean that the court can arbitrarily set an amount which it believes the representative could have obtained. Nor can it say that he should have made the investment in any particular type of security permitted by the law as a legal investment. * * * His duty is to use the care and good judgment that a reasonably prudent business man would use in investing his own funds. * * * It is not possible, however, for the court, where there has been no investment made, to say that one could have been made in a given type of security and a definite income received from it." We follow the reasoning expressed and so dissent, in part, as above noted.